**No. 25-6308**

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

---

JENNY LISETTE FLORES, *et al.*,
Plaintiffs-Appellees,

*v.*

PAMELA BONDI, ATTORNEY GENERAL OF THE UNITED STATES,
*et al.*,
Defendants-Appellants.

---

ON APPEAL FROM AN ORDER OF THE UNITED STATES
DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA

---

**DEFENDANTS-APPELLANTS' OPENING BRIEF**

---

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

DREW C. ENSIGN
Deputy Assistant Attorney General
Civil Division

AUGUST E. FLENTJE
Special Counsel for Immigration
Litigation

TIBERIUS DAVIS
Counsel to the Assistant Attorney
General

WILLIAM C. SILVIS
Assistant Director

MICHAEL A. CELONE
CHRISTINA PARASCANDOLA
Senior Litigation Counsel

JESSICA R. LESNAU
JOSHUA C. MCCROSKEY
Trial Attorneys
U.S. Department of Justice
Civil Division
Office of Immigration Litigation
P.O. Box 878, Ben Franklin
Station
Washington, DC 20044
(202) 305-1540
joshua.c.mccroskey@usdoj.gov

*Attorneys for Defendants-
Appellants*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................ iv

INTRODUCTION .............................................................................1

STATEMENT OF JURISDICTION ...................................................6

STATUTORY AUTHORITIES ..........................................................6

STATEMENT OF THE ISSUES........................................................6

STATEMENT OF THE CASE ...........................................................7

I.  Factual Background and Procedural History ................................7

    A.  The 1985 Complaint ......................................................7

    B.  The 1988 Rule ...............................................................9

    C.  *Reno v. Flores* (1993) ..................................................9

    D.  The 1997 *Flores* Settlement Agreement .....................10

    E.  Significant Changes in Circumstances Since 1997.................13

    F.  Enforcement Litigation and Expansion of the FSA to Family Units ...................................................................20

    G.  2019 Regulations and Denial of the Motion to Terminate....21

    H.  District Court's Retention of Jurisdiction over ORR's Implementation of the FSA at Secure, Heightened Supervision, and Out-of-Network Facilities.............................22

    I.  2025 ORR Policy Guidance .........................................23

    J.  Resumption of Operations in FRCs .............................24

II.  District Court Order Denying the 2025 Motion to Terminate ......25

ii

SUMMARY OF THE ARGUMENT.................................................................27

STANDARD OF REVIEW ...........................................................................30

ARGUMENT ...............................................................................................30

I.  Courts must be flexible in releasing government defendants
    from long-term institutional reform decrees...................................30

II. The district court abused its discretion in declining to
    terminate the FSA under Rule 60(b)(5) because prospective
    application is no longer equitable...................................................33

    A.  Enforcing the FSA is inequitable because it indefinitely
        entangles the judiciary in managing immigration policy......34

    B.  Enforcing the FSA is inequitable because it prescribes
        the substantive result of agency rulemaking. ..........................48

    C.  Enforcing the FSA is inequitable due to numerous
        changes in factual and legal circumstances. ..........................56

III. The district court erred in holding that 8 U.S.C. §1252(f)(1),
     as clarified by *Aleman Gonzalez*, does not apply to the FSA. .......64

IV.  The district court erred in holding that HHS had not
     substantially satisfied the FSA's terms. ........................................70

CONCLUSION .............................................................................................73

STATEMENT OF RELATED CASES ..............................................................75

CERTIFICATE OF COMPLIANCE...................................................................76

ADDENDUM ...............................................................................................77

# TABLE OF AUTHORITIES

## Cases

*Agostini v. Felton,*
521 U.S. 203 (1997) ....................................................................69

*Buck v. Davis,*
580 U.S. 100 (2017) ....................................................................64

*Bunikyte v. Chertoff,*
2007 WL 1074070 (W.D. Tex. Apr. 9, 2007).........................14

*Castañon-Nava v. DHS,*
2025 WL 3552514 (7th Cir. Dec. 11, 2025) ..........................37

*Citizens for a Better Env't v. Gorsuch,*
718 F.2d 1117 (D.C. Cir. 1983) ...............................................55

*Conn. Light & Power Co. v. Nuclear Regul. Comm'n,*
673 F.2d 525 (D.C. Cir. 1982) .................................................49

*Conservation Nw. v. Sherman,*
715 F.3d 1181 (9th Cir. 2013).............................................50-51

*David B. v. McDonald,*
116 F.3d 1146 (7th Cir. 1997)..................................................43

*Dep't of Com. v. New York,*
588 U.S. 752 (2019) ....................................................................49

*Evans v. City of Chicago,*
10 F.3d 474 (7th Cir. 1993).......................................................43

*Fiallo v. Bell,*
430 U.S. 787 (1977) ....................................................................35

*Fid. Nat'l Fin., Inc. v. Friedman,*
803 F.3d 999 (9th Cir. 2015).....................................................30

*Flores v. Barr,*
407 F. Supp. 3d 909 (C.D. Cal. 2019) ...............................21, 51-53, 61

*Flores v. Barr,*
934 F.3d 910 (9th Cir. 2019).....................................................40

iv

*Flores v. Johnson,*
212 F. Supp. 3d 864 (C.D. Cal. 2015) ................................20, 38, 40-41

*Flores v. Lynch,*
828 F.3d 898 (9th Cir. 2016) .................................................... *passim*

*Flores v. Meese,*
934 F.2d 991 (9th Cir. 1990) ..............................................................8

*Flores v. Reno,*
507 U.S. 292 (1993) ................................................................. *passim*

*Flores v. Rosen,*
984 F.3d 720 (9th Cir. 2020) .........................................................22

*Flores v. Sessions,*
394 F. Supp. 3d 1041 (C.D. Cal. 2017) ........................20, 39-40, 61, 69

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.,*
561 U.S. 477 (2010) .......................................................................44

*Frew v. Hawkins,*
540 U.S. 431 (2004) ..................................................................33, 45

*Galvez v. Jaddou,*
52 F.4th 821 (9th Cir. 2022) ........................................................65

*Garland v. Aleman Gonzalez,*
596 U.S. 543 (2022) ........................................................3, 29, 65-68

*Hall v. Haws,*
861 F.3d 977 (9th Cir. 2017).........................................................30

*Hall v. U.S. EPA,*
273 F.3d 1146 (9th Cir. 2001).......................................................50

*Henson v. Fid. Nat'l Fin., Inc.,*
943 F.3d 434 (9th Cir. 2019).........................................................33

*Horne v. Flores,*
557 U.S. 433, (2009) ................................................................ *passim*

*Housatonic River Initiative v. EPA,*
75 F.4th 248 (1st Cir. 2023)..........................................................55

v

*In re Pearson,*
990 F.2d 653 (1st Cir. 1993) ...................................................... 43

*Lab./Cmty. Strategy Ctr. v. L.A. Cnty. Metro. Transp. Auth.,*
564 F.3d 1115 (9th Cir. 2009) ................................................... 30

*Mathews v. Diaz,*
426 U.S. 67 (1976) ........................................................... 34-35, 56

*Mayo v. United States,*
319 U.S. 441 (1943) ................................................................ 39

*Miranda v. Garland,*
34 F.4th 338 (4th Cir. 2022) ................................................ 67-68

*Nat'l Audubon Soc., Inc. v. Watt,*
678 F.2d 299 (D.C. Cir. 1982) ................................................ 44

*New York v. United States,*
505 U.S. 144 (1992) ................................................................ 43

*NRDC v. EPA,*
859 F.2d 156 (D.C. Cir. 1988) ........................................... 49-50

*Perez v. Mortg. Bankers Ass'n,*
575 U.S. 92 (2015) ............................................................ 49, 72

*Rufo v. Inmates of Suffolk Cnty. Jail,*
502 U.S. 367 (1992) ................................................................ 43

*Trump v. Hawaii,*
585 U.S. 667 (2018) ................................................................ 35

*United States v. Asarco Inc.,*
430 F.3d 972 (9th Cir. 2005) ................................................... 30

*United States v. Carpenter,*
526 F.3d 1237 (9th Cir. 2008) ................................................. 51

*United States v. Washington,*
573 F.3d 701 (9th Cir. 2009) ................................................... 46

*Wages v. IRS,*
915 F.2d 1230 (9th Cir. 1990) ................................................. 30

*Whitewater Draw Nat. Res. Conservation Dist. v. Mayorkas,*
5 F.4th 997 (9th Cir. 2021) ................................................ 42


**Statutes**

5 U.S.C. §553 ................................................ 48-49, 72

6 U.S.C. §251 ................................................ 13

6 U.S.C. §271 ................................................ 13

6 U.S.C. §279 ................................................ 13-14

6 U.S.C. §291 ................................................ 13

6 U.S.C. §542 ................................................ 13

8 U.S.C. §1182(d)(5)(C) ................................................ 62

8 U.S.C. §1225(b)(1)(B)(ii), (iii)(IV) ................................................ 20, 65

8 U.S.C. §1225(b)(3) ................................................ 62

8 U.S.C. §1226(f) ................................................ 62

8 U.S.C. §1231(a) ................................................ 62, 65

8 U.S.C. §1232(b)(2)-(3) ................................................ 17

8 U.S.C. §1232(c) ................................................ 17, 60

8 U.S.C. §1252(f)(1) ................................................ *passim*

28 U.S.C. §1291 ................................................ 6

28 U.S.C. §1331 ................................................ 6

34 U.S.C. §30301 ................................................ 17

Homeland Security Act of 2002,
Pub. L. No. 107-296, 116 Stat. 2135 ................................................ 13

Laken Riley Act,
Pub. L. No. 119-1, 139 Stat. 3 (2025) ................................................ 4, 19, 62

One Big Beautiful Bill Act,
Pub. L. No. 119-21, 139 Stat. 72 (2025) ................................................ 4, 17, 19, 62-63

vii

William Wilberforce Trafficking Victims Protection Reauthorization
Act of 2008,
Pub. L. No. 110-457, 122 Stat. 5044................................................16-17

**Regulations**

6 C.F.R. §§115.10-95...................................................................... 17, 59

6 C.F.R. §115.13............................................................................. 18

6 C.F.R. §115.14(a)-(b)................................................................... 18

6 C.F.R. §115.113............................................................................ 18

6 C.F.R. §115.114(a)-(b) ................................................................. 18

8 C.F.R. §236.3(g) ......................................................................... 59

8 C.F.R. §236.3(i)(4)....................................................................... 59

8 C.F.R. §242.24 (1992) .................................................................. 9

45 C.F.R. pt. 410, subpart C............................................................ 60

45 C.F.R. §410.1302........................................................................ 59

45 C.F.R. §410.1307 ....................................................................... 59

45 C.F.R. §410.1309........................................................................ 59

45 C.F.R. pt. 411 ........................................................................... 18

Apprehension, Processing, Care, and Custody of Alien Minors and
Unaccompanied Alien Children,
84 Fed. Reg. 44,392 (Aug. 23, 2019).............................................. 21, 52

Detention and Release of Juveniles,
53 Fed. Reg. 17,449 (May 17, 1988) ................................................. 9

Standards to Prevent, Detect, and Respond to Sexual Abuse and
Assault in Confinement Facilities,
79 Fed. Reg. 13,100 (Mar. 7, 2014)................................................. 17

Standards to Prevent, Detect, and Respond to Sexual Abuse and
Sexual Harassment Involving Unaccompanied Children,
79 Fed. Reg. 77,768 (Dec. 24, 2014) ............................................... 18

*Unaccompanied Children Program Foundational Rule,*
   89 Fed. Reg. 34,384 (Apr. 30, 2024) ...................................................... 22

**Rules**

Fed. R. App. P. 4(a)(1)(B) ............................................................................ 6

Fed. R. Civ. P. 60(b)(4) ........................................................................ 7, 30

Fed. R. Civ. P. 60(b)(5) ......................................................................6-7, 31

## INTRODUCTION

After 40 years of litigation and 28 years of judicial micromanagement of a critical element of U.S. immigration policy by a single district court, it is time for this long running saga to end. Federal courts that enter consent decrees have an affirmative duty "to ensure that 'responsibility for discharging the [government's] obligations is returned promptly to the [Executive] and its officials.'" *Horne v. Flores*, 557 U.S. 433, 450 (2009). And while the damage to the separation of powers wrought by the consent decree here can never be undone, reversal is required to ensure that the power to control immigration is returned to the political branches.

Despite enormous changes in facts and law in the 28 years since its entry, the district court audaciously proclaimed that there is "nothing new under the sun regarding the facts or the law" underlying the consent decree. 1-ER-9, 1-ER-16-17. The court's blinkered view of factual and legal realities confirms that the district court does not intend for this consent decree to end. Ever.

The district court entered the *Flores* Settlement Agreement (FSA or Decree) as a consent decree in 1997—after the Executive had *won* at

1

the Supreme Court regarding the challenged rules—and amended it in December 2001. The FSA has governed the apprehension, processing, care, and custody of unaccompanied alien children (UACs) ever since through six administrations notwithstanding intervening legislation by Congress, agency regulations, and significant changes in migration patterns. And in 2015, the district court expanded the FSA to *accompanied* children, *see Flores v. Lynch*, 828 F.3d 898, 905-08 (9th Cir. 2016), even though it is obvious from the FSA's terms and the facts at the time that the parties did not contemplate their inclusion.

After decades of intolerable judicial intrusion, Defendants-Appellants (the government) moved under Federal Rule of Civil Procedure 60(b) to terminate the FSA. The FSA violates the separation of powers by indefinitely entangling the Judiciary in managing the core Executive function of immigration enforcement. The FSA also requires promulgating regulations that would violate the Administrative Procedure Act (APA) by making the notice-and-comment period performative. And the FSA does not account for many new factual and legal circumstances that make prospective application of the FSA contrary to the public interest. Each requires terminating the FSA.

2

In *Horne*, the Supreme Court required that lower courts considering Rule 60 motions merely ascertain whether ongoing enforcement of the original order "[i]s supported by an ongoing violation of federal law." 557 U.S. at 454. But the district court here did not engage in that inquiry at all or grapple with the significant legal and factual changes that have occurred. Instead, in denying the government's motion to terminate, the district court dismissed these significant changes as if nothing had changed in patterns of immigration or immigration law precedents since 1997. The district court's decision was manifestly wrong and contrary to *Horne*.

Since the FSA was entered, and even since the government's motion to terminate in 2019, there have been significant changes in the law and the facts that require terminating the FSA. *First*, the district court ignored the controlling effect of the Supreme Court's decision in *Garland v. Aleman Gonzalez*, 596 U.S. 543 (2022), which resolved any doubt that 8 U.S.C. §1252(f)(1) divests the district court of jurisdiction to enforce the FSA. *Second*, contrary to the APA, the district court ruled that the Department of Health and Human Services (HHS) could not substantially comply with the FSA through an interpretive rule, but

3

instead must promulgate a preordained rule through notice and comment adopting whatever gloss the district court might have on the FSA. The district court thus views itself as both judge, jury, and executioner – bound to oversee the FSA as long the government does not satisfy the FSA's termination provision by adopting regulations that fully implement the FSA consistent only with the court's whims. 1-ER-21.

*Third*, the district court effectively ignored the fact that the FSA substantially undermines the new mandatory detention provision in the Laken Riley Act, Pub. L. No. 119-1, 139 Stat. 3 (2025), and the One Big Beautiful Bill Act's blessing of Family Residential Centers (FRCs), Pub. L. No. 119-21, §90003, 139 Stat. 72, 358-59 (2025).

*Fourth*, the district court waived away the fact that illegal migration skyrocketed after 2019 and that the composition of illegal migration shifted, comprising significantly more UACs and families than before. Indeed, it is impossible to escape the conclusion that the FSA *itself* contributed to the increase in minors at the border, as it incentivizes traffickers to traffic children to receive better treatment and possible release. But the district court remains palpably blind to these entirely foreseeable—and now manifestly realized—consequences of its orders.

4

Finally, there is now a detailed custodial system to protect minors in custody. New statutes, regulations, policies, and practices provide for detained minors. Conditions for detained minors have never been better.

Despite fundamental developments in the law and the facts, the district court maintained that there were "no meaningful change[s]." 1-ER-9, 1-ER-16-17. The district court seems to view any possible change in migration patterns, any new policy insights or enforcement priorities, and any changes in the law as insufficient to justify termination. That conclusion is manifest error and implies that no change in law or facts would ever satisfy the district court or justify termination of the FSA. That is contrary to binding Supreme Court precedent. A single district court cannot have endless control over an ever-changing area of core Executive policy. The Executive Branch requires flexibility to address a constantly shifting landscape on the border. Our Constitution and its separation of powers demand as much. This Court should reverse the district court's order denying the government's motion to terminate and remand with instructions to terminate the FSA in its entirety with respect to all Defendants and dismiss the case.

5

## STATEMENT OF JURISDICTION

(1) The district court asserted federal question jurisdiction under 28 U.S.C. §1331. However, 8 U.S.C. §1252(f)(1) removes the district court's jurisdiction to enjoin or restrain the operation of certain immigration detention statutes.

(2) The district court denied the government's motion to terminate the FSA on August 15, 2025. 1-ER-21. This Court has appellate jurisdiction because the district court's order is final, 28 U.S.C. §1291, and, alternatively, because the district court refused to dissolve injunctions, id. §1292(a)(1).

(3) The government timely filed a notice of appeal on October 2, 2025. 5-ER-969; see Fed. R. App. P. 4(a)(1)(B).

## STATUTORY AUTHORITIES

The relevant statutory authorities appear in the Addendum.

## STATEMENT OF THE ISSUES

(1) Whether the district court erred in declining to terminate the FSA as inequitable under Fed. R. Civ. P. 60(b)(5) and (6) when (a) the FSA and its enforcement violate the Constitution's separation of powers; (b) the FSA and the district court orders require the government to promulgate regulations in violation of the APA; and (c) numerous

6

changed circumstances render the FSA outmoded especially because no ongoing violation of federal law is present.

(2) Whether the district court erred under Fed. R. Civ. P. 60(b)(4) and (5) in holding that 8 U.S.C. §1252(f)(1)'s jurisdictional limitation does not render void or inequitable the FSA.

(3) Whether the district court erred under Fed. R. Civ. P. 60(b)(5) in holding that HHS' regulations and internal policies were insufficient to establish substantial compliance warranting complete termination of the FSA as to HHS.

## STATEMENT OF THE CASE

### I. Factual Background and Procedural History

#### A. The 1985 Complaint

In 1984, in response to an uptick in illegal immigration and increased numbers of UACs, the former Immigration and Naturalization Service's (INS) Western Regional Office adopted an ad hoc policy permitting the release of detained minors—but only to their parents or legal guardians, except in extraordinary cases when the juvenile could be released to individuals who agreed to care for the child's wellbeing. *See Flores v. Reno*, 507 U.S. 292, 296 (1993).

7

On July 11, 1985, four plaintiffs, ages 13-16, in immigration custody, and unaccompanied by their parents or legal guardians, initiated this action. 5-ER-939-40. They sought certification of a class defined as "all persons under the age of 18 who have been, are, or will be arrested and detained pursuant to [former] 8 U.S.C. 1252 by the INS within INS' Western Region and who have been, are, or will be denied release from INS custody because" they are unaccompanied by any parent or guardian. *Flores v. Meese*, 934 F.2d 991, 994–95 (9th Cir. 1990) (citation modified), *opinion vacated and superseded on reh'g*, 942 F.2d 1352 (9th Cir. 1991), *rev'd and remanded*, 507 U.S. 292.

The four plaintiffs alleged that they were required to share sleeping quarters with unrelated adults, provided no educational materials or recreational activities, received no medical examinations, and were denied reasonable visitation with family and friends. 5-ER-937, 5-ER-950. Plaintiffs claimed that the INS's practices violated substantive due process, procedural due process, and the former-immigration-detention statute, 8 U.S.C. §1252 (repealed 1996).

8

## B.    The 1988 Rule

In May 1988, INS issued a rule adopting procedures relating to detention and release of juvenile aliens. *See* 53 Fed. Reg. 17,449 (May 17, 1988) (the 1988 Rule). The 1988 Rule provided that alien juveniles generally "shall be released, in order of preference, to: (i) a parent; (ii) a legal guardian; or (iii) an adult relative (brother, sister, aunt, uncle, grandparent) who are not presently in INS detention." 8 C.F.R. §242.24(b)(1) (1992). If the only listed individuals were also in INS detention, INS would consider simultaneous release of the juvenile and custodian "on a discretionary case-by-case basis." *Id.* §242.24(b)(2). INS could briefly hold the minor in any "INS detention facility having separate accommodations for juveniles," *Id.* §242.24(d), subject to certain minimum detention standards. Plaintiffs challenged this new rule.

## C.    *Reno v. Flores* (1993)

The district court granted summary judgment in favor of Plaintiffs, but the Supreme Court reversed. *Flores*, 507 U.S. at 315. The Supreme Court rejected Plaintiffs' substantive-due-process claim, explaining that "'juveniles, unlike adults, are always in some form of custody' …, and where the custody of the parent or legal guardian fails, the government

9

may (indeed, we have said *must*) either exercise custody itself or appoint someone else to do so." *Id.* at 302 (citation omitted). As to Plaintiffs' procedural-due-process claim, the Supreme Court found the Constitution was satisfied by an INS process entitling alien juveniles to a hearing on detention before an immigration judge. *Id.* at 309. The Court likewise rejected Plaintiffs' statutory-authority argument. *Id.* at 309-14.

### D. The 1997 *Flores* Settlement Agreement

On remand from the Supreme Court, the Clinton Administration agreed to settle. The FSA became effective on January 28, 1997, upon the district court's approval, and provides that the district court "shall retain jurisdiction over this action." 4-ER-693 (¶35).

The purpose of the FSA was to establish a "nationwide policy for the detention, release, and treatment of minors in the custody of the INS." 4-ER-683 (¶9). The parties expanded the settlement class beyond the Western Region, to cover "[a]ll minors who are detained in the legal custody of the INS." 4-ER-684 (¶10). A "minor" is defined as "any person under the age of eighteen (18) years who is detained in the legal custody of the INS," but excludes minors who have been emancipated or incarcerated due to a criminal conviction as an adult. 4-ER-682 (¶4).

10

The Decree addresses the custody of minors at all stages. Upon initial apprehension, the Decree provides that INS must hold minors in facilities that are "safe and sanitary" and "consistent with the INS's concern for the particular vulnerability of minors." 4-ER-684 (¶12). INS will then place a minor in a "licensed program" within certain timelines. 4-ER-684-85 (¶12.A). In the case of an "influx"—when over 130 minors are placed in licensed programs or are awaiting placement—minors must be placed "as expeditiously as possible." *Id*. A licensed program is defined as "any program … that is licensed by an appropriate State agency to provide … services for dependent children." 4-ER-682 (¶6).

The Decree further addresses release. 4-ER-686-87 (¶¶14-18). Release without unnecessary delay is required when "INS determines that the detention of the minor is not required either to secure his or her timely appearance before the INS or the immigration court, or to ensure the minor's safety or that of others." 4-ER-686 (¶14). The first preference is release to a "parent" or a "legal guardian." *Id*. Following that the order of preference is other close family members, individuals designated by a parent, a licensed program, or other adults in the discretion of INS. *Id*. These paragraphs of the Decree do not contain any provisions specifically

11

governing release when the minor is in custody with a parent or guardian.

The Decree also specifies that "[a] minor in deportation proceedings shall be afforded a bond redetermination hearing before an immigration judge in every case, unless the minor indicates … that he or she refuses such a hearing." 4-ER-689 (¶24.A).

The Decree includes implementation and termination provisions. The former is set forth in Paragraph 9, which specifies that "[w]ithin 120 days of the final district court approval of this Agreement, the INS shall initiate action to publish the relevant and substantive terms of this Agreement as a Service regulation" and that "[t]he final regulations shall not be inconsistent with the terms of this Agreement." 4-ER-683-84 (¶9).

Paragraph 40 addresses termination. As originally agreed to in 1997, it specified that "[a]ll terms of this Agreement shall terminate the earlier of five years after the date of final court approval of this Agreement or three years after the court determines that the INS is in substantial compliance with this Agreement." 4-ER-694 (¶40). When the original termination date was nearing, the parties amended Paragraph 40 to provide that the Decree "shall terminate 45 days following

12

defendants' publication of final regulations implementing this Agreement." 4-ER-711 (¶40). It specifies that notwithstanding termination, "INS shall continue to house the general population of minors in INS custody in facilities that are licensed for the care of dependent minors." *Id.*

### E. Significant Changes in Circumstances Since 1997

Since 1997 the United States' public-policy interests have shifted. Events such as the September 11, 2001 terrorist attacks, and the growth of national-security threats such as drug trafficking and human smuggling by transnational criminal organizations, have necessitated policy responses that could not have been reasonably contemplated in 1997.

In 2002, Congress abolished INS and transferred its functions to the newly created DHS. *See* Homeland Security Act of 2002 (HSA), Pub. L. No. 107-296, §§441, 451, 471, 116 Stat. 2135, 2205, 2308 (6 U.S.C. §§251, 271, 291, 542). With respect to the care of UACs, Congress transferred responsibility from the INS's UAC program to the Office of Refugee Resettlement (ORR) within HHS. 6 U.S.C. §279. ORR became responsible for coordinating and implementing the care and placement of

13

UACs, making and implementing placement determinations, overseeing the infrastructure and personnel of facilities in which UACs reside, and other functions. *See* 6 U.S.C. §279(b).

In the wake of 9/11, DHS ended the practice of "catch-and-release."[1] 2-ER-161. Previously, families apprehended at the border generally were released rather than detained because of limited bed space. *Id.*; *Bunikyte v. Chertoff*, 2007 WL 1074070, at *1 (W.D. Tex. Apr. 9, 2007). The catch-and-release practice had created enforcement vulnerabilities, namely that smugglers brought children across the border with groups of strangers and presented them as family units to avoid detention if apprehended. 2-ER-161-62. Catch-and-release also incentivized families to bring children on a dangerous journey. *Id.* To maintain family unity, U.S. Immigration and Customs Enforcement (ICE) opened family residential centers (FRCs). 2-ER-162. At the time, ICE used the INS Detention Standards promulgated in 2000, blended with traditional

---

[1]     Under the catch-and-release policy, the government issued aliens whom it apprehended at or near the border notices to appear in removal proceedings and released them on their own recognizance or bail. 2-ER-161.

14

juvenile standards, to establish a baseline of requirements and oversight procedures for FRCs. 2-ER-164-65.

In the meantime, the numbers of alien minors arriving in the United States each year increased enormously. While the numbers fluctuate from year to year, they remain significantly higher than the approximately 7,000 to 8,000 entering each year in the early 1990s. *See Flores*, 507 U.S. at 295 (recognizing that a surge of "more than 8,500" alien minors represented a "serious" problem). From fiscal year (FY) 1993 until FY2011, the numbers of UACs apprehended by the government stayed relatively consistent year-over-year. 2-ER-68, 2-ER-75. In FY2012, DHS referred 13,625 UACs to ORR. 2-ER-68. In FY2023, ORR received 118,938 referrals—a thirteenfold increase from the time the FSA was entered. *Id.*; 2-ER-78-79. The FSA's influx provision has been constantly exceeded.

The need to "hous[e] family units," which was not contemplated by the parties in 1997, *see Flores*, 828 F.3d at 906, became a significant issue. U.S. Customs and Border Protection (CBP) reported 14,855 Border Patrol encounters of individuals in family units along the southwest border in FY2013. 2-ER-27. CBP reported 614,020 encounters with

15

individuals in family units in FY2022, 993,940 individuals in family units in FY2023, and 996,070 in FY2024. 2-ER-59.

More recently, the numbers of encounters along the border have decreased, but even so they remained higher than they were in the early 1990s. In the first seven months of FY2025, Border Patrol reported 22,662 encounters with UACs and 50,662 with individuals in family units along the southwest border. 2-ER-27-28. Even with stronger enforcement and significantly fewer unlawful entries, however, the FSA continues to frustrate CBP's ability to carry out its mission of protecting the border. *See* 2-ER-31-32. Increases and wide fluctuations in the numbers of encounters and the numbers of UACs and family units in custody are difficult to plan for given their unpredictability. *See generally* 2-ER-24-55 (Modlin Decl.).

Since 1997, Congress and the agencies enacted protections for UACs in government custody. DHS must notify HHS within 48 hours of the apprehension or discovery of a UAC and transfer them to HHS's custody within 72 hours, absent exceptional circumstances and except when a UAC from a contiguous country is permitted to withdraw his or her application for admission. *See* William Wilberforce Trafficking

16

Victims Protection Reauthorization Act of 2008 (TVPRA), Pub. L. No. 110-457 §235, 122 Stat. 5044, 5074 (8 U.S.C. §1232(b)(2)-(3)); *see also* Pub. L. No. 119-21, § 100051(8) (2025) (extending the ability to withdraw an application for admission to UACs from non-contiguous countries). Further, UACs in HHS custody must be promptly placed in the least restrictive setting that is in the child's best interest, and, if placed in a secure facility, the placement shall be reviewed monthly. 8 U.S.C. §1232(c)(2)(A). Among other provisions, the TVPRA also establishes requirements regarding safety and suitability assessments of proposed custodians for UACs, access to counsel, and appointment of child advocates. *Id.* §1232(c)(3)-(6).

In 2014, pursuant to the Prison Rape Elimination Act (PREA), 34 U.S.C. §30301, *et seq.*, DHS issued regulations to prevent, detect, and respond to sexual abuse and assault in DHS confinement facilities. *See* 79 Fed. Reg. 13,100 (Mar. 7, 2014) (6 C.F.R. §115.10-95 (detention facilities), *id.* §115.110-195 (holding facilities)). Under DHS's PREA regulations, juveniles must be detained in the least restrictive setting appropriate to the juvenile's age and special needs, and facilities must hold juveniles apart from adult detainees, unless the juvenile is in the

17

presence of an adult family member, and provided the arrangement presents no safety or security concerns. 6 C.F.R. §§115.14(a)-(b) (detention), 115.114(a)-(b) (holding). Further, each facility must supervise detainees through appropriate staffing levels and, where applicable, video monitoring to protect detainees against sexual abuse, and must develop and document comprehensive-supervision guidelines. 6 C.F.R. §§115.13, 115.113. ORR issued similar regulations with respect to UACs in its custody. *See* 79 Fed. Reg. 77,768 (Dec. 24, 2014), codified at 45 C.F.R. pt. 411.

In October 2015, CBP issued its Transport, Escort, and Detention Standards (TEDS), implementing a CBP-wide policy that set forth nationwide standards to govern CBP's interaction with detained individuals. 2-ER-170-200. Under the TEDS policy, detainees generally should not be held for more than 72 hours in a CBP facility. 2-ER-183 (§4.1). TEDS establishes national standards for medical screening, gender separation, segregation of juveniles from adult populations (unless the adult is an immediate relative or legal guardian), and family unity. 2-ER-183-84 (§4.3). It also establishes standards for detainee privacy, hold-room conditions, consular access, lists of legal-services

18

providers, telephone access, bedding, hygiene, and access to food, water, and restrooms. 2-ER-185-87 (§§4.6-4.15).

In 2020, ICE updated its standards governing FRCs, the Family Residential Standards (FRS), which likewise set the standards for the care and custody of family units and juveniles. *See* 2-ER-207; FRS, 2-ER-209-319, 3-ER-321-616, 4-ER-618-58.

In January 2025, President Trump signed the Laken Riley Act into law. Pub. L. No. 119-1, 139 Stat. 3 (2025). It expanded the category of aliens who are subject to mandatory detention. *Id.* §2. Most importantly, states can now sue for injunctive relief if a release decision by DHS harms the state or its residents, which further supports and strengthens DHS's efforts to end catch-and-release and ensure compliance with the INA's mandatory-detention provisions. *See id.* §3.

On July 4, 2025, President Trump signed the "One Big Beautiful Bill Act" into law, which provides DHS funding to detain family units in FRCs throughout their removal proceedings. *See* Pub. L. No. 119-21, §90003 (2025). The Act defined "Family Residential Center" as a "facility used by [DHS] to detain family units of aliens (including alien children who are not [UACs]) who are encountered or apprehended by [DHS]." *Id.*

19

The Act also extended the ability to withdraw an application for admission to UACs from non-contiguous countries. *Id.* §100051(8).

## F. Enforcement Litigation and Expansion of the FSA to Family Units

Since 1997, there has been significant litigation over the FSA's terms, most of which arose from class counsel's fifteen motions to enforce the FSA. A few examples are below:

- In 2015, the district court held that the FSA also applies to accompanied minors in family units. *See Flores v. Johnson*, 212 F. Supp. 3d 864, 871 (C.D. Cal. 2015), *aff'd in part, rev'd in part*, 828 F.3d 898.

- In 2017, the district court held that ICE must make and record continuous efforts to release accompanied minors in expedited-removal proceedings, even though such minors are subject to mandatory detention under 8 U.S.C. §1225(b)(1)(B)(ii) or (iii)(IV). *Flores v. Sessions*, 394 F. Supp. 3d 1041, 1063-67 (C.D. Cal. 2017). The district court also concluded that Defendants must assess each individual class member in expedited-removal proceedings for discretionary, humanitarian parole. *Id.*

20

- In 2024, the district court held that alien juveniles waiting in Outdoor Congregation Areas—plots of land along the U.S.-Mexico border that are not controlled or owned by CBP—are detained in CBP custody. 4-ER-746.

## G. 2019 Regulations and Denial of the Motion to Terminate

In 2019, DHS and HHS published final regulations to implement the FSA. *See* 84 Fed. Reg. 44,392-535 (Aug. 23, 2019) (2019 Rule). The DHS regulations govern the apprehension and processing of unaccompanied and accompanied minors, and the care and custody of accompanied minors. *Id.* at 44,515-30 (DHS). The HHS regulations governed the care and custody of UACs. *Id.* at 44,530-35 (HHS).

After the government moved to terminate the FSA based on the 2019 Rule, the district court permanently enjoined the rule. The district court found that the provisions related to the detention of UACs and the licensing of family-detention facilities were inconsistent with the FSA. *Flores v. Barr*, 407 F. Supp. 3d 909, 916-20 (C.D. Cal. 2019). On appeal, this Court upheld the district court's permanent injunction of the DHS portions of the 2019 Rule, applicable to the care and custody of accompanied minors, concluding that those regulations differed

21

substantially from the FSA. *Flores v. Rosen*, 984 F.3d 720, 737 (9th Cir. 2020). But the Court reversed and remanded the district court's order as to most of the provisions related to CBP custody following initial apprehension and care and custody of UACs by HHS, because those provisions were consistent with the FSA. *Id.* at 737, 744.

**H.  District Court's Retention of Jurisdiction over ORR's Implementation of the FSA at Secure, Heightened Supervision, and Out-of-Network Facilities**

On April 30, 2024, HHS issued a rule governing the placement, care and custody of UACs. *Unaccompanied Children Program Foundational Rule*, 89 Fed. Reg. 34,384 (Apr. 30, 2024) (Foundational Rule). The government moved to terminate the FSA as to HHS, under Rule 60(b)(5), based on the Foundational Rule. 4-ER-716.

On June 28, 2024, the district court conditionally and partially terminated the FSA as to HHS, except for FSA ¶¶28.A, 32, and 33, which concern collection of certain information about UACs, attorney-client visits, and site visits, and as to the FSA provisions governing secure, heightened supervision, and out-of-network facilities. 4-ER-734-35. The court also held that termination was contingent on the Foundational Rule not being subsequently rescinded or modified inconsistent with the

22

FSA, and the court retained jurisdiction to modify its order, "should further changed circumstances make it appropriate." 4-ER-735.

With respect to UAC placements at secure, heightened supervision, and out-of-network facilities, the court ruled that the Foundational Rule failed to implement the FSA by: (1) "appear[ing] to impermissibly allow isolated or petty offenses to be considered in the decision to place [UACs] in a heightened supervision facility"; (2) "appear[ing], impermissibly, to allow placement in a heightened supervision facility solely because a child is ready to 'step down' from a secure facility"; and (3) "fail[ing] to provide substantive protections for the children placed at [out-of-network] facilities," and failing to ensure that out-of-network placements are governed by the same standards as those in network providers. 4-ER-726-27.

## I.     2025 ORR Policy Guidance

On May 19, 2025, HHS promulgated policy guidance in response to the district court's concerns in its June 2024 order as to HHS. 2-ER-68-73. First, ORR revised the UAC Policy Guide to delete references to isolated and petty offenses as a basis for placement in a heightened-supervision facility. 2-ER-69. Second, ORR updated its UAC Policy Guide

23

to remove a provision that previously listed the step-down of children from a secure placement to a heightened-supervision facility as a possible justification alone for placement. 2-ER-69-70. Third, ORR clarified that the same standards that apply to in-network providers will generally apply to out-of-network placements. 2-ER-70-73; 2-ER-100-02 (Policy Guide §1.4.6). The UAC Policy Guide update also clarifies that behavior management policies, as described in the Foundational Rule and Policy Guide, will apply to out-of-network placements. 2-ER-71.

## J. Resumption of Operations in FRCs

In March 2025, ICE resumed the operation of FRCs to house family units, for the purpose of increasing compliance with immigration obligations, reducing the number of absconders, and providing an option for housing members of the same family together. *See* 2-ER-203-04. Without FRCs, ICE's ability to monitor immigration cases and execute removal orders is compromised. 2-ER-204-07. FRCs provide a safe setting for family units awaiting removal together while advancing the public-policy interests in reducing the number of absconders and enabling ICE to better manage its resources. 2-ER-205.

## II.  District Court Order Denying the 2025 Motion to Terminate

On May 22, 2025, the government moved to terminate the FSA under Rules 60(b)(4), (5), and (6). 1-ER-6.

The district court denied the government's motion on August 15, 2025. 1-ER-21. The district court first held that 8 U.S.C. §1252(f)(1) poses no obstacle to its continued supervision of the FSA because §1252(f)(1) became law before the FSA was approved. 1-ER-8. The court ruled that the government had argued unsuccessfully for termination before based on §1252(f)(1) and that there was "nothing new under the sun regarding the facts or the law." 1-ER-9. The court reasoned that several FSA provisions did not implicate the detention statutes in §§1225, 1226, and 1231 because those FSA provisions govern the conditions of detention. 1-ER-10. The court tried to distinguish *Aleman Gonzalez* by asserting that, unlike the situation in *Aleman Gonzalez*, the government here freely agreed to the FSA. 1-ER-11.

Next, the court rejected the government's argument that DHS achieved substantial compliance with the FSA. 1-ER-13-15. The court also held that HHS had not satisfied the FSA through its policy guidance because the updated guidance does not have the "force of law." 1-ER-15-

25

16. The court decided that the agencies must follow the "traditional APA rulemaking process." 1-ER-16.

As to the government's analysis of the separation of powers, the Supreme Court's decision in *Horne*, and the massive influxes of border crossings, the court held that the government pointed "to no meaningful change 'either in factual conditions or in law' since their last motion to terminate." 1-ER-16-17. The court likewise dismissed the Laken Riley Act and the One Big Beautiful Bill Act as posing no obstacles to compliance with the FSA. 1-ER-17 & n.8. The court then held that the government had not implemented a "durable remedy" that would justify termination because the agencies had not adopted a "compliant federal regulation." 1-ER-17-18.

Finally, the court rejected the government's argument that the FSA violates the APA. 1-ER-18. The court noted that the parties and the court were aware of the APA in 1997 and "the Parties attested to the lawfulness of the Agreement when they drafted it, and courts may not approve consent decrees that violate the law." *Id.* The court also maintained that the FSA does not "preordain" a specific rulemaking outcome and does not

26

require the final regulations to be a "carbon copy" of the Decree. 1-ER-18-19. Therefore, the court denied the motion to terminate.

## SUMMARY OF THE ARGUMENT

I.    The district court erred in concluding that prospective application of the FSA is equitable. The district court should have terminated the FSA under Rule 60(b)(5) or (6).

A.    The FSA is inequitable because it indefinitely entangles the district court in overseeing immigration policy, a subject particularly committed to the political branches. The FSA was too broad from the start, and it has become even more impermissibly intrusive through the district court's many orders enforcing and expanding it. The judicial intrusion is not necessary to remedy an ongoing violation of federal law. Therefore, it must end.

B.    The FSA is inequitable because it requires the government to promulgate regulations that implement exactly the terms of the FSA. Under the APA, the government may not bind itself to a regulatory outcome in such a way that the notice-and-comment process becomes a mere façade. The district court here insisted that the FSA does not compel that illegal outcome, but its prior orders do just that.

27

C.    The FSA is inequitable because numerous changed factual and legal circumstances make compliance with the FSA not in the public interest. The FSA constricted the government's ability to respond to massive increases in border crossings over the last few years. The FSA inhibits officials' flexibility to respond to unpredictable changes in migration patterns. New officials have determined that family detention is needed to enforce the immigration laws, and Congress has passed new statutes that provide for increased detention and discourage release. But the district court has put severe limits on family detention, even though the parties to the FSA did not contemplate, and could not reasonably have contemplated, the issues of irregular family migration and wide fluctuations in the numbers of children entering the United States.

Finally, the FSA is fundamentally unnecessary because through statutes, regulations, and policies, the government is complying with the underlying federal law through means other than the FSA. Thus, the district court should have returned control to the Executive Branch.

II.    The district court should have terminated the FSA as to DHS and dissolved the injunction of the 2019 Rule because the district court lacked jurisdiction to enter the FSA or to enjoin the 2019 Rule under 8

28

U.S.C. §1252(f)(1). The parties in 1997, and the district court and this Court in their previous decisions, did not have the benefit of *Aleman Gonzalez*, 596 U.S. 543 (2022). That decision resolved any doubt that §1252(f)(1) divests the district court of jurisdiction to enforce the FSA, which includes numerous provisions that enjoin or restrain the operation of the INA's detention provisions. Therefore, the district court erred by not terminating the FSA under Rule 60(b)(4) or (5).

III. The district court erred in concluding that HHS has not satisfied the FSA through its Foundational Rule and the policy guidance interpreting the Foundational Rule. In 2024, the district court mostly terminated the FSA as to HHS, but the court held that three specific parts of the Foundational Rule are inconsistent with the FSA and do not warrant termination. In 2025, HHS issued interpretive guidance clarifying that it interprets (and applies) the Foundational Rule in a manner consistent with the court's reading of the Decree. Therefore, the district court should have held that HHS satisfied the FSA and terminated the decree as to HHS.

29

## STANDARD OF REVIEW

This Court reviews *de novo* the district court's decision on a Rule 60(b)(4) motion for relief from judgment. *Fid. Nat'l Fin., Inc. v. Friedman*, 803 F.3d 999, 1001 (9th Cir. 2015). The Court reviews the district court's rulings on motions for relief from judgment under Rule 60(b)(5) and (6) for abuse of discretion. *Hall v. Haws*, 861 F.3d 977, 984 (9th Cir. 2017); *United States v. Asarco Inc.*, 430 F.3d 972, 978 (9th Cir. 2005). "A district court abuses its discretion when its equitable decision is based on an error of law or a clearly erroneous factual finding." *Lab./Cmty. Strategy Ctr. v. L.A. Cnty. Metro. Transp. Auth.*, 564 F.3d 1115, 1119 (9th Cir. 2009) (citation modified). The district court's interpretation of the consent decree and any underlying questions of law are reviewed *de novo*. *Flores*, 828 F.3d at 905; *Hall*, 861 F.3d at 984.

## ARGUMENT

### I. Courts must be flexible in releasing government defendants from long-term institutional reform decrees.

Federal Rule of Civil Procedure 60(b) provides several avenues for a litigant to seek relief from judgment. "Pursuant to Rule 60(b)(4), a litigant may attack a judgment as void due to lack of subject matter jurisdiction." *Wages v. IRS*, 915 F.2d 1230, 1234 (9th Cir. 1990).

30

Rule 60(b)(5) provides that a court "may relieve a party ... from a final judgment, order, or proceeding" when "the judgment has been satisfied, released, or discharged" or when "applying it prospectively is no longer equitable." Fed. R. Civ. P. 60(b)(5). The Supreme Court has explained that the disjunctive language of Rule 60(b)(5) clarifies that each of these grounds for relief is "independently sufficient." *Horne v. Flores*, 557 U.S. 433, 454, (2009). Under the first clause of Rule 60(b)(5), relief from judgment is appropriate when a judgment has been satisfied according to its own provisions.

In contrast, the "equitable" clause allows "a court to modify or vacate a judgment or order if a significant change either in factual conditions or in law renders continued enforcement detrimental to the public interest." *Id.* at 447 (cleaned up). Where the government seeks relief from an "institutional reform" decree, courts must apply a "flexible approach" to "ensure that responsibility for discharging the [government's] obligations is returned promptly to the [government] and its officials when the circumstances warrant." *Id.* at 448-50 (cleaned up).

A flexible approach is necessary for several reasons. First, "the passage of time frequently brings about changed circumstances—

31

changes in the nature of the underlying problem, changes in governing law or its interpretation by the courts, and new policy insights—that warrant reexamination of the original judgment." *Id.* at 447-48. Second, these types of decrees often involve core government responsibilities and raise federalism or separation-of-powers concerns. *See id.* at 448. Last, "public officials sometimes consent to, or refrain from vigorously opposing, decrees that go well beyond what is required by federal law." *Id.* Future officials then "inherit overbroad or outdated consent decrees" that unduly constrain "their ability to fulfill their duties as democratically elected officials." *Id.* at 449.

Thus, when determining whether to vacate an institutional-reform decree under Rule 60(b)(5), courts must consider "whether ongoing enforcement of the original order [is] supported by an ongoing violation of federal law." *Id.* at 454. If the government has implemented a "durable remedy" to comply with the underlying federal law, judicial oversight must cease. *Id.* at 450. Once a party carries its burden to show that changed circumstances warrant relief from a consent decree, "a court abuses its discretion when it refuses to modify an injunction or consent decree in light of such changes." *Id.* at 447 (citation modified).

32

Rule 60(b)(6) also permits relief from judgment "whenever such action is appropriate to accomplish justice." *Henson v. Fid. Nat'l Fin., Inc.*, 943 F.3d 434, 443-44 (9th Cir. 2019) (citation modified). The FSA should be terminated under each provision.

## II. The district court abused its discretion in declining to terminate the FSA under Rule 60(b)(5) because prospective application is no longer equitable.

Because the FSA—through its terms, interpretation and applications, as well as its duration—is contrary to law and harms the public interest, it is no longer equitable. The FSA violates the separation of powers by indefinitely entangling the district court in managing immigration policy. It mandates the substantive results of agency rulemaking, in violation of the APA. And it fails to provide Executive officials the flexibility needed to respond to changing factual and legal circumstances.

The Supreme Court has repeatedly emphasized the dangers of institutional-reform injunctions and admonished courts to return promptly as much control as possible to the policymaking officials accountable to the voters. *See Horne*, 557 U.S. at 447-51; *Frew v. Hawkins*, 540 U.S. 431, 442 (2004). Courts should not be in the business

of micromanaging the day-to-day of executive agencies, and oversight is legitimate only to the extent necessary to remedy violations of federal law. *See Horne*, 557 U.S. at 447-51. Each passing year makes the 1997 FSA more illegitimate, especially because the Government is fulfilling the underlying obligations of federal law by "other means." *Id.* at 439. The district court has not found an ongoing violation of federal law that justifies the maintenance of this decree. The district court should therefore have terminated the FSA.

**A.    Enforcing the FSA is inequitable because it indefinitely entangles the judiciary in managing immigration policy.**

The FSA violates the separation of powers by permitting ongoing judicial micromanagement of immigration matters committed to the Executive. The Supreme Court has explained—in this very case—"[f]or reasons long recognized as valid, the responsibility for regulating the relationship between the United States and our alien visitors has been committed to the political branches of the Federal Government." *Flores v. Reno*, 507 U.S. 292, 305 (1993) (quoting *Mathews v. Diaz*, 426 U.S. 67, 81 (1976)). Immigration policy involves "changing political and economic circumstances" that are appropriate for the political branches to address,

34

not the Judiciary. *Mathews*, 426 U.S. at 81. "For more than a century," it has been well settled that a matter implicating foreign relations—such as immigration policy—is a "fundamental sovereign attribute" of the government's Executive and Legislative Branches and "largely immune from judicial control." *Trump v. Hawaii*, 585 U.S. 667, 702 (2018) (quoting *Fiallo v. Bell*, 430 U.S. 787, 792 (1977)). For these reasons, respect for the political branches' authority over immigration policy dictates a narrow standard of judicial review. *Mathews*, 426 U.S. at 81-82; *Fiallo*, 430 U.S. at 792, 796.

Contravening these well-settled principles, the FSA has created a substantial and unprecedented intrusion by the Judiciary into the Executive's administration of immigration policy. The scope of the FSA was too broad from the start, and its overbreadth was exacerbated when it was interpreted to apply to the very different context of *accompanied* children. *Flores v. Lynch*, 828 F.3d 898, 905-08 (9th Cir. 2016). The district court has arrogated sensitive, ever-changing, and expert policy determinations to itself at the expense of the Executive and the people's elected government in perpetuity. That must end.

**1.** From its inception, the FSA intruded on core Executive functions and unduly bound future administrations despite substantial changes in the law and circumstances on the ground. The FSA "sets out nationwide policy for the detention, release, and treatment of minors in the custody of the INS." 4-ER-683 (¶9). It governs an open-ended, ever-changing, and never-ending class of "[a]ll minors who are detained in the legal custody of the INS." 4-ER-684 (¶10). This class has included millions of people over the years. The FSA—originally designed to address a very specific set of narrow circumstances—has been interpreted to address the custody of all minors at all stages. 4-ER-684-90 (¶¶12, 14-19, 21-27). It specifies details about custodial conditions at numerous and varied facilities, procedural provisions, and release policies. *Id.* Paragraph 9 mandates rulemaking and provides that "[t]he final regulations shall not be inconsistent with the terms of this Agreement." 4-ER-683-84 (¶9).

These significant judicial intrusions have no temporal limit either. Instead, amended Paragraph 40 states that the FSA "shall terminate 45 days following defendants' publication of final regulations implementing this Agreement," 4-ER-711 (¶40, as amended Dec. 7, 2001), which criteria

can only be satisfied by a determination by the Judiciary that the Executive's regulations are sufficient. As explained below, publishing final regulations implementing the FSA to meet criteria determined by the Judiciary—without regard to any comments received or to any changed circumstances since 1997—would be contrary to the APA. And it binds all administrations in perpetuity, as the district court made clear that it would retain jurisdiction if the rules were ever modified. 4-ER-734. The Judiciary cannot control sensitive areas of immigration policy for eternity under our republican Constitution. *See Castañon-Nava v. DHS*, 2025 WL 3552514, at \*12 (7th Cir. Dec. 11, 2025) (Kirsch, J., dissenting).

**2.** Worse yet, the district court's interpretation and enforcement of the FSA has significantly expanded beyond its text and original purpose. Even when the FSA is silent or unclear, the district court has issued specific directives managing nationwide immigration policy and enforcement.

For example, while the FSA "does not address the potentially complex issues" of housing family units, "does not contain standards related to the detention of … family units," and "gave inadequate

37

attention to some potential problems of accompanied minors," *Flores*, 828 F.3d at 906, the district court nonetheless applied the FSA to family units and required release of *accompanied* minors under specified deadlines and standards irrespective of the custody status of their parents or legal guardians. *Flores v. Johnson*, 212 F. Supp. 3d 864, 871, 886-87 (C.D. Cal. 2015), *aff'd in part, rev'd in part*, 828 F.3d 898; 4-ER-787. Also, in 2020, the court recognized that "Paragraph 12.A does not enumerate which rights must be included in a notice." 4-ER-757. Yet the court nonetheless interpreted Paragraph 12.A to require a very specific "notice of rights pertaining to custody and release." *Id.* In contrast, the court held that the FSA's use of the phrase "following arrest" did not require any actual "arrest" to be triggered. *See* 4-ER-745. In practice, the FSA has effectively been interpreted as if it were an open-ended grant of authority to the *Judiciary* to set policy regarding alien children. That is not equity; it is usurpation.

Further compounding the judicial intrusions upon the authority of the Executive, the district court has repeatedly applied the FSA to situations the parties did not anticipate, such as to aliens held pending expulsion pursuant to the Title 42 public health order issued during the

38

COVID-19 pandemic. 4-ER-767-84. The court also interpreted the FSA's terms to apply to placements in out-of-network facilities, 4-ER-727, despite the absence of any mention of such facilities or any indication that the parties even contemplated out-of-network facilities in 1997. And in 2024, the court applied the FSA's requirements to outdoor congregation areas, a novel situation that the court called "open-air detention sites," despite acknowledging that "it may be true that CBP did not initially *intend* for these locations to become" detention sites and CBP did not actually take any steps to hold anyone at these sites. 4-ER-744.

The court has likewise tried to prohibit the use of FRCs because they are not state-licensed, even though state-licensing of those facilities is in most cases literally impossible because the states lack any licensing scheme. *See Flores v. Sessions*, 394 F. Supp. 3d 1041, 1069 (C.D. Cal. 2017). It is well settled under the intergovernmental immunity doctrine that "the activities of the Federal Government are free from regulation by any state." *Mayo v. United States*, 319 U.S. 441, 445 (1943). It follows that immigration detention should not be subject to state-licensing standards.

The court also has stretched the FSA to dictate how the government may implement the immigration-detention statutes. It required the government to show that it detains family units only for the amount of time needed to expeditiously screen family members for reasonable or credible fear, a requirement absent in any statute, *Flores*, 394 F. Supp. 3d at 1070; *see also* 4-ER-787 (in the context of the pandemic requiring ICE to release children detained at FRCs for more than 20 days). Likewise, although the expedited-removal statute does not require an individualized assessment of release for accompanied children placed in expedited removal, the court ordered the government to individually assess those accompanied children for release on parole even where the applicable statute does not permit release on the grounds relied upon by the court. *Flores*, 394 F. Supp. 3d at 1066-67; *Flores v. Barr*, 934 F.3d 910, 916-17 (9th Cir. 2019); 4-ER-807. In addition, though the FSA explicitly grants some flexibility to the government during times of influx, the court has rendered that flexibility illusory. *See, e.g., Flores*, 212 F. Supp. 3d at 887 ("Defendants shall not selectively apply the 'influx' provision …."). Although reversed by this Court, the district court sought to expand the FSA to require the government to release parents from

40

immigration detention. *See id.* at 886-87. All of these issues are far afield from the issues facing UACs when the FSA was entered.

**3.** Beyond dictating how the Government must enforce the immigration-detention statutes, the district court also has overridden the agencies' expert judgments regarding the actions necessary to protect class members and the community. For example, the court prohibited ORR from placing children in particular secure facilities based on gang affiliation. 5-ER-921-22. The court further ordered ORR to stop its uniform requirement that post-release services be in place in the community before releasing a child to a sponsor. 5-ER-932. And, during the COVID-19 pandemic, the court required ORR to release children to sponsors without conducting the fingerprint-background checks that ORR believed necessary to address "the dangers" inherent in releasing UACs to "improperly vetted sponsor[s]." 4-ER-802-03; *see* 4-ER-789. ORR has complied with all such orders, including incorporating the district court's interpretation of the FSA into the Foundational Rule. But these examples illustrate how the district court has expanded the scope of the FSA and the extent of the court's involvement in Executive operations.

41

By engaging in such wide-ranging management of Executive agencies, the district court has exceeded the constitutional limits on the judicial role. The FSA's general terms and expansive interpretations have encouraged Plaintiffs' systemic challenges, seeking "*wholesale improvement … by court decree*"—"properly matters that should be pursued in the 'offices of the Department[s] [of Homeland Security and Health and Human Services] or the halls of Congress, where programmatic improvements are normally made.'" *Whitewater Draw Nat. Res. Conservation Dist. v. Mayorkas*, 5 F.4th 997, 1011 (9th Cir. 2021) (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990)). The district court, by contrast, has micromanaged federal-immigration agencies and directed changes by the agencies through court decree.

4.     In denying the government's motion to terminate, the district court dismissed these concerns by stating that the government raises "nothing new under the sun." 1-ER-9, 1-ER-16-17. The district court ignored that the FSA was wrong from the start and that each passing year and each new court order only further demonstrate the decree's illegitimacy.

42

The district court also characterized its longstanding and increasingly intrusive interference as merely enforcing the parties' Decree. 1-ER-20-21. But the Clinton administration's consent to the FSA does not forever justify the perpetual judicial intrusion. The "Constitution's division of power among the three branches is violated where one branch invades the territory of another, whether or not the encroached-upon branch approves the encroachment." *New York v. United States*, 505 U.S. 144, 182 (1992). And the FSA "is no ordinary contract," because it is now effectively open-ended and, as interpreted in response to Plaintiffs' insistence, "it requires continuing supervision by the district court." *Evans v. City of Chicago*, 10 F.3d 474, 477-78 (7th Cir. 1993) (en banc) (plurality opinion). The district court's "decrees implicate the citizenry's interests as well as those of the parties and bear directly on the salubrious operation of public institutions." *In re Pearson*, 990 F.2d 653, 658 (1st Cir. 1993); *see Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 381, (1992).

For these reasons, "[c]onsent alone is insufficient to support a commitment by a public official that ties the hands of his successor." *Evans*, 10 F.3d at 478; *see David B. v. McDonald*, 116 F.3d 1146, 1150

(7th Cir. 1997) ("[I]n a democracy the people may vote out politicians whose acts displease them, and elect new representatives who promise change."); *cf. Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 497 (2010) ("Perhaps an individual President might find advantages in tying his own hands…. He cannot, however, choose to bind his successors by diminishing their powers"). As the D.C. Circuit has explained, there are "potentially serious constitutional questions about the power of the Executive Branch to restrict its exercise of discretion by contract with a private party." *Nat'l Audubon Soc., Inc. v. Watt*, 678 F.2d 299, 301 (D.C. Cir. 1982). Thus, the government's consent to the FSA 28 years ago—*i.e.*, five Presidential Administrations ago—does not render lawful the breach of the separation of powers that the FSA continues to impose.

The Supreme Court has expressed serious concern that "injunctions of this sort bind state and local officials to the policy preferences of their predecessors and may thereby improperly deprive future officials of their designated legislative and executive powers." *Horne*, 557 U.S. at 449 (citation modified). The Supreme Court therefore criticized the lower courts for failing to consider "whether, as a result of important changes

44

during the intervening years, the State was fulfilling its obligations under the [law] by other means." *Id.* at 439. The Court went on to observe that a "flexible approach" to modifying such consent decrees allows courts to "ensure that responsibility for discharging the State's obligations is returned promptly to the State and its officials when the circumstances warrant." *Id.* at 450 (citation modified).

Focusing on the terms of the original injunction, instead of the underlying federal law, causes the court to "improperly substitute[]" its own "policy judgments for those of the state and local officials to whom such decisions are properly entrusted." *Id.* at 455. To avoid this danger, courts must consider "whether ongoing enforcement of the original order [is] supported by an ongoing violation of federal law." *Id.* at 454. If the government has implemented a "durable remedy" to the alleged violations of federal law, judicial oversight should cease. *Id.* at 450. Additionally, "federal-court decrees exceed appropriate limits if they are aimed at eliminating a condition that does not violate [federal law] or does not flow from such a violation." *Id.* (alteration in original) (citation omitted); *see also Frew*, 540 U.S. at 441 (overbroad remedies in consent decrees "may … lead to federal-court oversight of state programs for long

45

periods of time even absent an ongoing violation of federal law"); *United States v. Washington*, 573 F.3d 701, 710 (9th Cir. 2009).

Here, the FSA and its enforcement by this Court implicate each of the Supreme Court's concerns in *Horne*. The FSA raises sensitive separation-of-powers concerns and involves immigration and foreign policy—areas of core Executive Branch responsibility. For nearly three decades, the FSA has improperly divested Executive Branch officials of their full legitimate policymaking powers. Even if concerns about violations of the Constitution existed in 1997, the agencies have addressed them by promulgating regulations that far exceed the constitutional floor. *See generally* 2019 Rule; Foundational Rule; *see also* 2-ER-67-73 (describing further updates to ORR's UAC Policy Guide to establish policies consistent with the district court's June 28, 2024 order as to HHS). Indeed, the Supreme Court found that the former INS's *1988 Rule* did not violate alien minors' substantive or procedural due process rights. *Flores*, 507 U.S. at 315. So the FSA is in many respects void *ab initio*.

In the order on appeal here, the district court did not analyze "whether ongoing enforcement of the original order [is] supported by an

46

*ongoing violation of federal law.*" *Horne*, 557 U.S. at 454 (emphasis added). The district court repeatedly focused on the terms of the FSA instead of considering whether the government was fulfilling its obligations under federal law through other means. 1-ER-18 ("Termination of a consent decree pursuant to Rule 60(b)(5) requires implementation of 'a durable remedy,' which in this case … the Parties have always understood to be a compliant federal regulation."); 1-ER-21 ("[I]t is the Government that continues to bind itself to the FSA by failing to fulfill its side of the Parties' bargain."). That is the exact error that the Supreme Court condemned in *Horne*. *See* 557 U.S. at 439.

The district court, thus, should have dissolved the FSA because it is precisely the type of institutional-reform injunction that the Supreme Court cautioned against: it prevents the government from exercising its constitutional powers to develop new policies to address the changes in immigration to the United States. The FSA divests the Executive of its power to respond to new situations and foreign-relations concerns and transfers that power to the Judiciary, which is not equipped to change nor responsible to the public for its failures.

47

Moreover, the public interest is not served by permitting the unelected class counsel to wield litigation to facilitate the district court's indefinite supervision of the immigration system, which involves multiple agencies, hundreds of thousands of class members, and vast taxpayer resources. This Court should end the district court's superintendence of this aspect of immigration policy and return responsibility for determining and executing immigration policy to the political branches.

## B. Enforcing the FSA is inequitable because it prescribes the substantive result of agency rulemaking.

The district court erred in holding that the FSA does not impermissibly mandate the result of agency rulemaking. As interpreted by the district court, Paragraph 9 requires the government to "publish the relevant and substantive terms of this Agreement as a Service regulation" in order to ever terminate the consent decree. This creates an obligation that binds all future administrations to promulgate and maintain substantive legislative rules in violation of the APA. Such a requirement is inequitable and requires termination of the FSA.

Section 4 of the APA, 5 U.S.C. §553, prescribes a three-step procedure for "notice-and-comment rulemaking." First, the agency must

issue a "[g]eneral notice of proposed rule making." *Id.* §553(b). Second, after the required notice, the agency must "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments." *Id.* §553(c). "An agency must consider and respond to significant comments received during the period for public comment." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015); *see Dep't of Com. v. New York*, 588 U.S. 752, 773 (2019). Third, when promulgating the final rule, the agency must include in the rule's text "a concise general statement of [its] basis and purpose." 5 U.S.C. §553(c).

"The process of notice and comment rule-making is not to be an empty charade." *Conn. Light & Power Co. v. Nuclear Regul. Comm'n*, 673 F.2d 525, 528 (D.C. Cir. 1982). Interested parties must have the opportunity "to participate in a meaningful way in the discussion and final formulation of rules." *Id.* Therefore, APA rulemaking does not permit a contractual Decree to preordain any specific outcome. Indeed, "a binding promise to promulgate [final regulations] in the proposed form would seem to defeat Congress's evident intention that agencies proceeding by informal rulemaking should maintain minds open to whatever insights the comments produced … may generate." *NRDC v.*

49

*EPA*, 859 F.2d 156, 194 (D.C. Cir. 1988); *see also Hall v. U.S. EPA*, 273 F.3d 1146, 1163 (9th Cir. 2001) ("[T]he point of notice-and-comment rulemaking is that public comment will be considered by an agency and the agency may alter its actions in light of those comments.").

Likewise, this Court has held that a court must not enter or enforce a consent decree that would require an agency to violate "procedural requirements" for rulemaking set by statute. *Conservation Nw. v. Sherman*, 715 F.3d 1181, 1188 (9th Cir. 2013). In *Conservation Northwest*, this Court considered "whether a district court may approve resolution of litigation involving a federal agency through a consent decree, which substantially and permanently amends regulations that the agency could only otherwise amend by complying with statutory rulemaking procedures." *Id.* at 1183. This Court held that the district court had abused its discretion by approving that kind of consent decree, which "impermissibly conflicts with laws governing the process for such amendments" to the regulations. *Id.* at 1189.

Here, as interpreted by the district court, the FSA requires the agencies to close their eyes to alternatives and to adopt the provisions of the FSA in the final rule without regard to any comments received,

50

changed circumstances since 1997, or new policy insights. 4-ER-683-84 (¶9). Such preordained rulemaking would violate the APA. Thus, the FSA is improper because it "impermissibly conflicts with laws governing the process" for rulemaking. *Conservation Nw.*, 715 F.3d at 1189. The Executive officials did not have the authority to agree to the FSA as so interpreted. *See United States v. Carpenter*, 526 F.3d 1237, 1242 (9th Cir. 2008). And the district court does not have the authority to enforce the FSA prospectively. *Conservation Nw.*, 715 F.3d at 1185.

The district court reasoned that the FSA must be consistent with the APA because the parties and the court were aware of the APA when the FSA was approved in 1997. 1-ER-18. This reasoning ignores the possibility that the parties and the court made an error in 1997, and it misses how the district court's subsequent orders have made the rulemaking provisions of the FSA more onerous. *See Flores v. Barr*, 407 F. Supp. 3d 909, 925 (C.D. Cal. 2019) (construing "strictly" the FSA's provisions about regulations), *aff'd in part, rev'd in part*, 984 F.3d 720.

Next, the district court maintained that the FSA does not "preordain" a specific rulemaking outcome and does not require the final regulations to be a "carbon copy" of the Decree. 1-ER-18-19. But, in

51

practice, that is exactly what the district court has done. The district court has held that "only final regulations that 'implement' the *Flores* Agreement, incorporate 'the relevant and substantive terms,' and are consistent with the terms thereof may formally terminate this consent decree." *Flores*, 407 F. Supp. 3d at 925 (citation modified).

Start in 2019, the government published regulations to set forth a nationwide policy addressing the custody and care of children in immigration custody. *See* 2019 Rule, 84 Fed. Reg. 44,392. This was performed consistently with the government's understanding that the FSA required it to engage in a rulemaking process regarding the treatment of detained minors—but not that the FSA required any preordained result. 4-ER-853, 4-ER-873-78.

The district court disagreed. It interpreted the FSA to mean that the final regulations must match *exactly* the substantive terms of the FSA—as well as the court's subsequent interpretation of those terms. *See Flores*, 407 F. Supp. 3d at 925 ("Since conditions subsequent are not favored by the law, and are construed strictly, and the New Regulations do not codify numerous relevant and substantive terms of the *Flores* Agreement, the *Flores* Agreement remains fully intact." (citation

52

modified)). Since the 2019 Rules were not an exact match, the district court enjoined them. *Id.* at 931. As interpreted by the district court in 2019, the FSA requires any future Executive Branch officials to adopt the specific policies in the FSA that were agreed to by the Clinton Administration over 28 years ago.

Similarly, the district court did not fully terminate the FSA as to HHS because the district court interpreted minor portions of the Foundational Rule to be inconsistent with the FSA. *See* 4-ER-726-27.

The district court made its extreme position clear in this case. In 2024, the district court partially and conditionally terminated the FSA as to HHS, but kept in place the FSA provisions governing secure, heightened supervision, and out-of-network facilities. 4-ER-726-27, 4-ER-734-35. The district court ruled that certain pieces of the Foundational Rule were inconsistent with the FSA based on speculative hypotheticals. 4-ER-726-27. As a result, HHS issued several interpretive rules clarifying the issues the court raised. Yet the district court said that was insufficient because HHS did not bind itself through notice-and-comment rulemaking. 1-ER-15-16. So not only does the district court

53

require specific substantive outcomes, but it requires specific procedures as well contrary to the APA.

Even the pieces of the Foundational Rule that the district court approved demonstrate the impermissible extent of judicial interference. HHS had to convince the district court to modify the FSA by showing that state licensing is not available in Texas and Florida, that HHS had implemented several different mechanisms to replace a state-licensing scheme, and that the Foundational Rule returns the parties as "nearly as possible to where they would have been" under the FSA absent the changed circumstances. 4-ER-721-25, 4-ER-728-29. HHS was not free to follow new policy insights or to respond to comments on its proposed rule. Rather, it had to regulate in accordance with the FSA and with the district court's views on whether to modify the FSA.

Even more concerning, the district court states that the FSA could continue to bind agencies' policy choices forever, even *after* the publication of consistent regulations and the Decree's termination. 4-ER-734 ("The Court's termination of the FSA as to HHS is therefore *conditional* on there not being a recission of those regulations[.]" (emphasis added)). Despite HHS's publication of regulations

54

implementing the FSA, the district court retained jurisdiction "to modify the Agreement or this Order should further changed circumstances necessitate, to ensure that the Rule faithfully implements the FSA as the parties originally contemplated." *Id.* Neither voters nor their chosen officials could ever choose a different path. That is no way to run a democracy.

Other circuit courts have held that decrees cannot mandate the substantive result of any subsequent rulemaking as the district court has required here. *See Housatonic River Initiative v. EPA*, 75 F.4th 248, 267-68 (1st Cir. 2023) ("Importantly, as the Petitioners concede, the Settlement did not legally constrain the EPA in deciding what provisions to include in the final permit."); *Citizens for a Better Env't v. Gorsuch*, 718 F.2d 1117, 1121, 1129 (D.C. Cir. 1983) (holding that a consent decree was permissible when it "did not specify the substantive result of any regulations EPA was to propose" and did not "prescribe the content of the regulations"). The district court reasoned that the FSA complies with the APA merely because "promulgation of a regulation was not the underlying purpose of the" FSA. 1-ER-19. That is irrelevant. The courts in *Housatonic River Initiative* and *Citizens for a Better Environment* did

55

not focus on whether the parties' ultimate goals were environmental or regulatory. The courts there emphasized that the decrees were permissible because they did not prescribe the contents of the regulations. FSA Paragraphs 9 and 40, in contrast, do prescribe the substantive content of regulations to escape the perpetual bind of the Decree. Therefore, as interpreted by the district court, the Decree requires specific notice-and-comment rulemaking and yet requires the agencies to close their minds impermissibly to insights they may gain through that very process.

As interpreted by the district court, the FSA requires the government to choose between violating the APA and being forever subject to judicial oversight and control. Because that forced choice is inequitable, the FSA should be terminated.

### C. Enforcing the FSA is inequitable due to numerous changes in factual and legal circumstances.

The Executive Branch and its agencies must respond to changes in immigration trends and laws. Immigration policy by definition involves "changing political and economic circumstances," making it particularly appropriate for political—not judicial—maintenance and control. *Mathews*, 426 U.S. at 81. In its motion to terminate, the government

identified numerous changes in factual circumstances and the law that render continued enforcement of the FSA "detrimental to the public interest." *Horne*, 557 U.S. at 453. The district court largely dismissed these changed circumstances as "nothing new under the sun" and "no meaningful change." 1-ER-9, 1-ER-16-17. That conclusion is manifest error.

**1.**     *First*, the number of children crossing or attempting to cross the southwest border rose to unprecedented numbers, and the FSA hamstrung the government in addressing this catastrophic illegal migration. 2-ER-25-28, 2-ER-30-32. In the 1990s, INS encountered 7,000 to 8,000 alien minors each year at the border. *See Flores*, 507 U.S. at 295; 2-ER-68, 2-ER-75. Given the stability in alien-minor entries during the 12 years of litigation, the parties reasonably agreed that an "influx" occurred when the INS had more than 130 minors in its custody. 4-ER-685 (¶12.B). In FY2023, the total number of UAC apprehensions at the southwest border was 131,519, and in FY2024, almost 100,000, compared to 76,020 in FY2019. 2-ER-27-28; 4-ER-661.

Even the 2019 numbers were an order of magnitude greater than at the time of the FSA. Nothing in the FSA suggests that the parties

57

anticipated that the government would eventually encounter hundreds of thousands or even tens of thousands of alien minors per year. Indeed, the influx exception has been almost continually met for decades, demonstrating that the parties could not have anticipated this substantial change.

*Second*, the FSA did not address *accompanied* minors because at the time family crossings were virtually nonexistent. *Flores*, 828 F.3d at 906. Yet in FY2023, the total number of family-unit apprehensions at the southwest border was 621,311—compared to 473,682 in FY2019, when the district court last considered the government's motion to terminate entirely the FSA—a 31% increase. 2-ER-27, 4-ER-662. The surge in border encounters of accompanied and unaccompanied minors has undermined the ability of DHS to comply with the FSA. 2-ER-30-32, 2-ER-37-38. The antiquated FSA simply does not account for the recent and potential volume of border encounters.

*Third*, the changed conditions of custody warrant the termination of the FSA, or at the very least the FSA provisions related to custodial conditions. The original case challenged the conditions of UAC custody, alleging UACs: (1) did not receive any educational materials; (2) did not

58

have access to medical or mental-health care; (3) lacked access to phones and could not communicate with family members or attorneys; (4) received zero recreation time; (5) were denied family visitation; (6) were subject to strip searches; (7) were held with unrelated adults; and (8) could not be released from these conditions unless a parent or legal guardian submitted to an interrogation. *See generally* 5-ER-935-65 (Complaint). It is undeniable that conditions have drastically improved.

Under DHS's and HHS's own policies and regulations, the agencies provide the relief originally sought in the complaint to the extent permitted by law. At the appropriate stages of their custody, alien minors receive formal education, have routine access to doctors, dentists and psychologists, and have access to regular phone calls to talk to family and attorneys. *See* 8 C.F.R. §236.3(i)(4); 45 C.F.R. §§410.1302, 410.1307, 410.1309; 3-ER-430-65 (FRS §4.3). They have food menus designed by dieticians, access to showers, clean clothing, toys, television, recreation time, and more. *See* 8 C.F.R. §236.3(i)(4); 45 C.F.R. §410.1302; 3-ER-393-423 (FRS §4.1). Strip searches are prohibited, and UACs are no longer held with unrelated adults. 8 C.F.R. §236.3(g); 6 C.F.R. §§115.10-95, 115.110-195; 2-ER-178-87 (TEDS §§3.0, 4.0); 3-ER-324-346 (FRS §§2.6-

2.7). As to UACs, HHS releases minors without unnecessary delay to a vetted sponsor—who need not be a parent or legal guardian— consistent with statutory and regulatory requirements. *See, e.g.*, 8 U.S.C. §1232(c)(2), (3); 45 C.F.R. pt. 410, subpart C. Because the government's custody regulations and policies now provide the precise relief sought in the original complaint, judicial oversight is no longer equitable. *Horne*, 557 U.S. at 450-56.

As a result, the district court should have considered whether there was an underlying violation of the law that the Decree was still needed to remedy. Clearly there is not. The district court dismissed this as a result of its enforcement of the FSA. 1-ER-18. That is not entirely true, as new laws instigated some rules. But even so, such new rules count towards substantial compliance, not against it.

*Fourth*, as of March 2025, DHS has re-instituted FRCs, which will house accompanied minors and their accompanying parents or legal guardians, to ensure proper custodial conditions for family units who are subject to detention and to ensure the United States retains its ability to enforce immigration laws. 2-ER-203. These FRCs are necessary to ensure that DHS can comply with the mandatory-detention authorities, as well

as keep families together while they await a decision on their immigration proceeding. 2-ER-204-07. The previously enjoined DHS regulations would govern the FRCs if the district court's 2019 injunction were dissolved.

Previously, the district court deemed only two of the DHS provisions to be inconsistent with the FSA: the provisions related to "expeditious release" of accompanied minors (FSA ¶¶14, 18); and the licensing requirements for FRCs (FSA ¶19). *Flores*, 407 F. Supp. 3d at 916-20. As the Ninth Circuit has expressly recognized—the FSA "does not address the potentially complex issues involving the housing of family units and the scope of parental rights for adults apprehended with their children." *Flores*, 828 F.3d at 906. Similarly, requiring DHS to comply with independent-licensing requirements for FRCs amounts to an impossible task. State licensing of such facilities is in most cases impossible because family detention is not something that states license. *See Flores*, 394 F. Supp. 3d at 1069. Of course, family detention generally only arises in the immigration-law context.

The FSA as interpreted by the district court and this Court would require DHS to present parents and legal guardians of accompanied

61

minors with a binary choice to either waive the child's right to be released under the FSA or waive her parental right to be detained with her child and permit her child to be temporarily released to someone else's care and custody. This dilemma is not necessary apart from the FSA. Holding accompanied children in immigration detention is consistent with the detention statutes and does not violate class members' due process rights or any other federal law. *Flores*, 507 U.S. at 302, 309, 315. Given the reopening of FRCs that are equipped to hold children and families, this change in factual circumstance warrants the termination of the FSA provisions related to release.

**2.** *Fifth*, Congress has enacted new statutes favoring detention over release. In January 2025, the Laken Riley Act expanded mandatory detention and allowed states to sue if DHS releases such aliens. Pub. L. No. 119-1, §§2-3; 8 U.S.C. §§1182(d)(5)(C), 1225(b)(3), 1226(f), 1231(a)(2)(B). The FSA can require release despite the Laken Riley Act's mandatory detention provisions.

*Sixth*, on July 4, 2025, the One Big Beautiful Bill Act provided funding for DHS to detain family units in FRCs throughout their removal proceedings. *See* Pub. L. No. 119-21, §90003 (2025). Congress defined

62

"Family Residential Center" as a "facility used by [DHS] to detain family units of aliens (including alien children who are not [UAC]) who are encountered or apprehended by [DHS]." *Id.* This change shows that Congress approves of FRCs to house class members. Despite explicit funding by Congress, the FSA makes the use of FRCs impossible based on non-existent state licensing or equivalent requirements.

3.      The district court ruled that "[n]one of these are changed circumstances." 1-ER-17. If massive surges in migration, new regulations, and new statutes do not suffice, then there can never be changed circumstances. That flouts *Horne.*

The district court ruled that the Laken Riley Act and the One Big Beautiful Bill Act pose no obstacles to compliance with the FSA. 1-ER-17 & n.8. But the district court's order provides no comfort to DHS, which may be sued under the Laken Riley Act by a state in which a released alien causes harm. And the district court's order does not explain why Congress would have appropriated money to detain families in FRCs throughout their removal proceedings unless Congress wanted such detention. As the situation stands now, DHS cannot fully use the money

63

Congress appropriated because the district court is enforcing the FSA's restriction on the FRC.

The judicial involvement in this case has been excessive, has continued for too many years, and fails to account for changed circumstances. Therefore, prospective application of the FSA and its resulting micromanagement of the Executive is not equitable. The district court erred in failing to grant relief under Rule 60(b)(5). In the alternative, the district court should have granted relief from judgment under Rule 60(b)(6) because this case presents the kind of "extraordinary circumstances" that cause injustice to the parties and risk "undermining the public's confidence in the judicial process." *Buck v. Davis*, 580 U.S. 100, 123 (2017).

**III. The district court erred in holding that 8 U.S.C. §1252(f)(1), as clarified by *Aleman Gonzalez*, does not apply to the FSA.**

The district court should have terminated the FSA because the district court lacked jurisdiction to enter the FSA under 8 U.S.C. §1252(f)(1). This requires termination under Rule 60(b)(4) because the injunction is void for lack of jurisdiction and under Rule 60(b)(5) due to a change in decisional law since the last motion in 2019. The district court erred in rejecting both grounds for termination.

64

In 8 U.S.C. §1252(f)(1), Congress provided that "no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation" of 8 U.S.C. §§1221-1231 "other than with respect to … an individual alien." 8 U.S.C. §1252(f)(1); *Galvez v. Jaddou*, 52 F.4th 821, 830 (9th Cir. 2022). These sections include the sources of DHS's authority to detain class members, which are in §§1225(b)(1)(B)(ii), 1225(b)(1)(B)(iii)(IV), 1225(b)(2)(A), 1226, and 1231(a).

The Supreme Court's decision in *Garland v. Aleman Gonzalez*, 596 U.S. 543 (2022), resolved any doubt that §1252(f)(1) divests courts of jurisdiction to enjoin or restrain the operation of the immigration-detention provisions in the INA. The Supreme Court stated that "§1252(f)(1) generally prohibits lower courts from entering injunctions that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions." *Aleman Gonzalez*, 596 U.S. at 550. The Supreme Court held that §1252(f)(1) prohibited injunctions requiring the government to provide bond hearings to a class because the injunctions "require officials to take actions that (in the Government's view) are not required by

65

§1231(a)(6) and to refrain from actions that (again in the Government's view) are allowed by §1231(a)(6)." *Id.* at 551.

Because the custody and detention of class members are pursuant to provisions governed by §1252(f)(1), *Aleman Gonzalez* makes plain that the district court lacked jurisdiction to enter the FSA. The FSA explicitly governs "detention" and "release." 4-ER-683 (¶9). Many of the FSA's core provisions "require officials to take actions that (in the Government's view) are not required by" the covered statutes "and to refrain from actions that (again in the Government's view) are allowed by" the covered statutes. *Aleman Gonzalez*, 596 U.S. at 551. The FSA mandates that the government place minors in a "licensed program" within certain timelines. 4-ER-684-85 (¶12.A). The FSA requires release "without unnecessary delay" in situations where the covered statutes mandate detention, and it requires the government to "make and record prompt and continuous efforts" toward release. 4-ER-686-87 (¶¶14, 18). The FSA also specifies that "[a] minor in deportation proceedings shall be afforded a bond redetermination hearing before an immigration judge in every case," unless the minor refuses the hearing. 4-ER-689 (¶24.A). Therefore, the FSA violates the jurisdictional limit of §1252(f)(1). The same is true

66

of the district court's permanent injunction of DHS's 2019 regulations, which enjoined covered detention provisions.

The parties in 1997 did not have the benefit of the Supreme Court's 2022 decision in *Aleman Gonzalez*. Therefore, contrary to the district court's reasoning, it does not matter that §1252(f)(1) became law before the FSA was approved, as its scope was still in dispute. 1-ER-8. Moreover, §1252(f)(1) is not waivable since it is jurisdictional. *See Miranda v. Garland*, 34 F.4th 338, 354-56 (4th Cir. 2022) (collecting cases).

Likewise, it does not matter that the FSA can conceivably operate in harmony with the covered statutory provisions. *See* 1-ER-10. The FSA requires "officials to take actions that (in the Government's view) are not required by" the covered statutes "and to refrain from actions that (again in the Government's view) are allowed by" the covered statutes. *Aleman Gonzalez*, 596 U.S. at 551. Thus, it is impermissible under §1252(f)(1).

Moreover, the FSA's provisions requiring release and bond hearings have more than "some collateral effect" on the operation of the covered detention statutes. 1-ER-10. The decision of when and how to release aliens is squarely encompassed by 1252(f)(1). *Miranda*, 34 F.4th at 356.

67

And injunctions requiring bond hearings are the very orders that the Supreme Court struck down in *Aleman Gonzales*. 596 U.S. at 551.

The district court here tried to distinguish *Aleman Gonzales* in two ways. First, the district court noted that *Aleman Gonzales* did not involve a consent decree. 1-ER-11. That does not matter. As the district court has recognized, a consent decree is an injunction. 4-ER-794. Section 1252(f)(1) deprives lower courts of "jurisdiction or authority" to enter such injunctions. The parties could not vest the court with authority that Congress precluded in §1252(f)(1) as, once again, it is jurisdictional. *Miranda*, 34 F.4th at 354-56.

Second, the district court stated that *Aleman Gonzales* is distinguishable because, while the injunction there "provided no exceptions," the FSA "contains multiple provisions recognizing, and deferring to, Defendants' discretion." 1-ER-11. But §1252(f)(1) prohibits requiring the government to take or to refrain from taking procedural actions, even if the ultimate substantive decision is left to the government's discretion. That is why the Supreme Court struck down the class-wide order requiring bond hearings in *Aleman Gonzalez*. The district court here has interpreted the FSA as requiring class-wide

68

procedural steps that the covered detention statutes do not require. *See, e.g.*, *Flores*, 394 F. Supp. 3d at 1063-67 (holding that Defendants must assess each individual class member in expedited-removal proceedings for discretionary, humanitarian parole). Furthermore, given the district court's interpretation that the FSA requires specific regulations, it is difficult to see how the government retains meaningful discretion. The district court does not have the jurisdiction to enter that kind of order because of §1252(f)(1).

Relief is thus warranted under Rule 60(b)(4) because the injunction is void for lack of jurisdiction and under Rule 60(b)(5) due to a change in decisional law. Indeed, "[a] court errs [under Rule 60(b)(5)] when it refuses to modify an injunction or consent decree in light of" "changes in either statutory or decisional law." *Agostini v. Felton*, 521 U.S. 203, 215 (1997). Moreover, prospective application of the FSA is inequitable because it is now clear that the district court lacks jurisdiction to enforce major portions of the FSA. The Supreme Court's clarification of §1252(f)(1) has made the FSA and the parties' initial bargain unrecognizable. The FSA should be terminated, and the injunction on DHS's portion of the 2019 Rule should be lifted.

69

**IV.  The district court erred in holding that HHS had not substantially satisfied the FSA's terms.**

At a minimum, this Court must terminate the Decree for HHS because the agency has substantially complied with its terms. In 2024, the district court partially and conditionally terminated the FSA as to HHS, but kept in place the FSA provisions governing secure, heightened supervision, and out-of-network facilities. 4-ER-726-27. The district court ruled that those pieces of the Foundational Rule were not consistent with the FSA based on speculative hypotheticals. *Id.* In 2025, to remedy this, ORR published policy guidance clarifying that it interprets the Foundational Rule in a way that addressed the district court's concerns. Thus, the Foundational Rule, as interpreted, fully implements the FSA as to HHS. The district court nevertheless abused its discretion in declining to terminate the FSA fully as to HHS because the interpretive rules "lack the force of law." 1-ER-16.

The district court initially concluded that HHS failed to implement the FSA because the Foundational Rule could hypothetically allow isolated or petty offenses to be considered in the decision to place a UAC in a heightened-supervision facility. 4-ER-726. ORR has now clarified that isolated and petty offenses are not a basis for such placement. 2-ER-

70

69, 2-ER-84-87 (Policy Guide §1.2.4). ORR further clarified that it will consider whether the child "has a non-violent criminal or delinquent history not warranting placement in a secure facility but which evidences a behavioral concern that requires an increase in supervision" when determining whether to place a UAC in such a facility. 2-ER-69.

HHS also has responded to the district court's conclusion that HHS appeared to allow placement in a heightened-supervision facility "solely because a child is ready to 'step-down' from a secure facility." 4-ER-726. ORR has foreclosed such an interpretation by removing the provision at issue. 2-ER-69.

ORR also addressed the district court's conclusion that the Foundational Rule "fail[ed] to provide substantive protections for the children placed" at out-of-network facilities and to ensure that out-of-network placements are governed by the same standards as in-network providers. 4-ER-727. ORR updated its Policy Guide to explicitly establish that it applies the same standards to out-of-network placements that apply to in-network placements, taking into account the specialized nature of out-of-network facilities and ORR's single-case agreements with such facilities for individual children. 2-ER-70-73. Because the new

71

policy guidance eliminates any basis for concluding that the Foundational Rule does not satisfy the FSA, the district court should have fully dissolved the FSA as to HHS under Rule 60(b)(5).

Instead, the district court held that HHS had not satisfied the FSA through its policy guidance because the updated guidance does not have the "force of law." 1-ER-15-16. The court decided that the agencies must follow the "traditional APA rulemaking process," seemingly notice-and-comment rulemaking. *Id.* The district court erred in that decision. ORR published interpretive rules in its Policy Guide to resolve the district court's hypothetical concerns.

Provided for by the APA, interpretive rules are "rules or statements issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers." U.S. Dep't of Justice, Attorney General's Manual on the Administrative Procedure Act 30 n.3 (1947); *see also* 5 U.S.C. §§553(b), (d)(2). Although interpretive rules lack the "force of law," that does not remove them from the APA definition of "rule." *See Perez*, 575 U.S. at 96 ("Not all 'rules' must be issued through the notice-and-comment process."). The FSA only requires the "publication of final regulations," but it does not require a specific type of

72

rule or procedure. 4-ER-683-84 (¶9), 4-ER-711 (¶40). This new procedural requirement dictates that the agencies must use notice-and-comment rulemaking with a preordained outcome even though the APA allows for other procedures. This absurd gloss proves that the district court is mandating specific procedural and substantive outcomes in violation of the APA.

The district court did not rely on any other reason to keep HHS bound to the FSA. *See* 1-ER-15-16. In short, the district court concluded that HHS had not "demonstrated substantial compliance" based solely on the district court's belief that a few provisions of the Foundational Rule *could* be interpreted contrary to how ORR actually interprets them. 1-ER-16 n.6. That was error. The district court should have concluded that HHS had satisfied the termination provision of Paragraph 40 and terminated the FSA fully as to HHS.

## CONCLUSION

The Court should reverse the district court and remand with instructions to terminate the FSA and dismiss the case.

Dated: December 22, 2025

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

DREW C. ENSIGN
Deputy Assistant Attorney General
Civil Division

AUGUST E. FLENTJE
Special Counsel for Immigration
Litigation

TIBERIUS DAVIS
Counsel to the Assistant Attorney
General

WILLIAM C. SILVIS
Assistant Director

MICHAEL A. CELONE
CHRISTINA PARASCANDOLA
Senior Litigation Counsel

*s/ Joshua C. McCroskey*
JOSHUA C. MCCROSKEY
JESSICA R. LESNAU
Trial Attorneys
U.S. Department of Justice
Civil Division
Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
(202) 305-1540
joshua.c.mccroskey@usdoj.gov

*Attorneys for Defendants-Appellants*

74

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

**9th Cir. Case Number(s)** <u>25-6308</u>

The undersigned attorney or self-represented party states the following:

[ ] I am unaware of any related cases currently pending in this court.

[ ] I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

[X] I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

*Flores v. Bondi*, No. 24-3656; *Flores v. Bondi*, No. 25-820; *Flores v. Bondi*, No. 25-5443; *Flores v. Bondi*, No. 25-6567; *Flores v. Bondi*, No. 25-7468. These appeals arise from the same district court case.

**Signature** <u>*s/ Joshua C. McCroskey*</u>　　　　**Date: December 22, 2025**

75

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number(s)** <u>25-6308</u>

I am the attorney or self-represented party.

**This brief contains 13,985 words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party or parties are filing a single brief in response to multiple briefs; or
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** <u>*s/ Joshua C. McCroskey*</u>    **Date: December 22, 2025**

76

# ADDENDUM

## Table of Contents for Addendum

I.    8 U.S.C. §1252(f)(1) ....................................................................... 78

II.   Laken Riley Act ............................................................................ 78

III.  One Big Beautiful Bill Act (§§90003, 100051, 100052) ................. 82

77

## I.  8 U.S.C. §1252(f)(1)

**(f) Limit on injunctive relief**
**(1) In general**
Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter, as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated.

8 U.S.C. §1252(f)(1).

## II.  Laken Riley Act

An Act To require the Secretary of Homeland Security to take into custody aliens who have been charged in the United States with theft, and for other purposes.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

SECTION 1. SHORT TITLE.
This Act may be cited as the "Laken Riley Act".

### SEC. 2. DETENTION OF CERTAIN ALIENS WHO COMMIT THEFT.

Section 236(c) of the Immigration and Nationality Act (8 U.S.C. 1226(c)) is amended—
(1) in paragraph (1)—
(A) in subparagraph (C), by striking "or";
(B) in subparagraph (D), by striking the comma at the end and inserting ", or"; and
(C) by inserting after subparagraph (D) the following:

(E)(i) is inadmissible under paragraph (6)(A), (6)(C), or (7) of section 212(a); and

"(ii) is charged with, is arrested for, is convicted of, admits having committed, or admits committing acts which constitute the essential elements of any burglary, theft, larceny, shoplifting, or assault of a law enforcement officer offense, or any crime that results in death or serious bodily injury to another person,";

(2) by redesignating paragraph (2) as paragraph (4); and

(3) by inserting after paragraph (1) the following:

"(2) DEFINITION.—For purposes of paragraph (1)(E), the terms 'burglary', 'theft', 'larceny', 'shoplifting', 'assault of a law enforcement officer', and 'serious bodily injury' have the meanings given such terms in the jurisdiction in which the acts occurred.

"(3) DETAINER.—The Secretary of Homeland Security shall issue a detainer for an alien described in paragraph (1)(E) and, if the alien is not otherwise detained by Federal, State, or local officials, shall effectively and expeditiously take custody of the alien.".

## SEC. 3. ENFORCEMENT BY ATTORNEY GENERAL OF A STATE.

(a) INSPECTION OF APPLICANTS FOR ADMISSION.—Section 235(b) of the Immigration and Nationality Act (8 U.S.C. 1225(b)) is amended—

(1) by redesignating paragraph (3) as paragraph (4); and

(2) by inserting after paragraph (2) the following:

"(3) ENFORCEMENT BY ATTORNEY GENERAL OF A STATE.—The attorney general of a State, or other authorized State officer, alleging a violation of the detention and removal requirements under paragraph (1) or (2) that harms such State or its residents shall have standing to bring an action against the Secretary of Homeland Security on behalf of such State or the residents of such State in an appropriate district court of the United States to obtain appropriate injunctive relief. The court shall advance on the

79

docket and expedite the disposition of a civil action filed under this paragraph to the greatest extent practicable. For purposes of this paragraph, a State or its residents shall be considered to have been harmed if the State or its residents experience harm, including financial harm in excess of $100.".

(b) APPREHENSION AND DETENTION OF ALIENS.—Section 236 of the Immigration and Nationality Act (8 U.S.C. 1226), as amended by this Act, is further amended—
    (1) in subsection (e)—
        (A) by striking "or release"; and
        (B) by striking "grant, revocation, or denial" and insert "revocation or denial"; and
    (2) by adding at the end the following:
        "(f) ENFORCEMENT BY ATTORNEY GENERAL OF A STATE.—The attorney general of a State, or other authorized State officer, alleging an action or decision by the Attorney General or Secretary of Homeland Security under this section to release any alien or grant bond or parole to any alien that harms such State or its residents shall have standing to bring an action against the Attorney General or Secretary of Homeland Security on behalf of such State or the residents of such State in an appropriate district court of the United States to obtain appropriate injunctive relief. The court shall advance on the docket and expedite the disposition of a civil action filed under this subsection to the greatest extent practicable. For purposes of this subsection, a State or its residents shall be considered to have been harmed if the State or its residents experience harm, including financial harm in excess of $100.".

(c) PENALTIES.—Section 243 of the Immigration and Nationality Act (8 U.S.C. 1253) is amended by adding at the end the following:
    "(e) ENFORCEMENT BY ATTORNEY GENERAL OF A STATE.—The attorney general of a State, or other authorized State officer, alleging a violation of the requirement to discontinue granting visas to citizens, subjects, nationals, and residents as

80

described in subsection (d) that harms such State or its residents shall have standing to bring an action against the Secretary of State on behalf of such State or the residents of such State in an appropriate district court of the United States to obtain appropriate injunctive relief. The court shall advance on the docket and expedite the disposition of a civil action filed under this subsection to the greatest extent practicable. For purposes of this subsection, a State or its residents shall be considered to have been harmed if the State or its residents experience harm, including financial harm in excess of $100.".

(d) CERTAIN CLASSES OF ALIENS.—Section 212(d)(5) of the Immigration and Nationality Act (8 U.S.C. 1182(d)(5)) is amended—

(1) by striking "Attorney General" each place such term appears and inserting "Secretary of Homeland Security"; and

(2) by adding at the end the following:

"(C) The attorney general of a State, or other authorized State officer, alleging a violation of the limitation under subparagraph (A) that parole solely be granted on a case-by-case basis and solely for urgent humanitarian reasons or a significant public benefit, that harms such State or its residents shall have standing to bring an action against the Secretary of Homeland Security on behalf of such State or the residents of such State in an appropriate district court of the United States to obtain appropriate injunctive relief. The court shall advance on the docket and expedite the disposition of a civil action filed under this subparagraph to the greatest extent practicable. For purposes of this subparagraph, a State or its residents shall be considered to have been harmed if the State or its residents experience harm, including financial harm in excess of $100.".

(e) DETENTION.—Section 241(a)(2) of the Immigration and Nationality Act (8 U.S.C. 1231(a)(2)) is amended—

(1) by striking "During the removal period," and inserting the following:

"(A) IN GENERAL.—During the removal period,"; and

(2) by adding at the end the following:

"(B) ENFORCEMENT BY ATTORNEY GENERAL OF A STATE.—The attorney general of a State, or other authorized State officer, alleging a violation of the detention requirement under subparagraph (A) that harms such State or its residents shall have standing to bring an action against the Secretary of Homeland Security on behalf of such State or the residents of such State in an appropriate district court of the United States to obtain appropriate injunctive relief. The court shall advance on the docket and expedite the disposition of a civil action filed under this subparagraph to the greatest extent practicable. For purposes of this subparagraph, a State or its residents shall be considered to have been harmed if the State or its residents experience harm, including financial harm in excess of $100.".

(f) LIMIT ON INJUNCTIVE RELIEF.—Section 242(f) of the Immigration and Nationality Act (8 U.S.C. 1252(f)) is amended by adding at the end following:

"(3) CERTAIN ACTIONS.—Paragraph (1) shall not apply to an action brought pursuant to section 235(b)(3), subsections (e) or (f) of section 236, or section 241(a)(2)(B).".

Approved January 29, 2025.

Laken Riley Act, Pub. L. No. 119-1, 139 Stat. 3 (2025).

## III.  One Big Beautiful Bill Act (§§90003, 100051, 100052)

SEC. 90003. DETENTION CAPACITY.

(a) IN GENERAL.—In addition to any amounts otherwise appropriated, there is appropriated to U.S. Immigration and Customs Enforcement for fiscal year 2025, out of any money in the Treasury not otherwise appropriated, to remain available until September 30, 2029, $45,000,000,000, for single adult alien detention capacity and family residential center capacity.

(b) DURATION AND STANDARDS.—Aliens may be detained at family residential centers, as described in subsection (a), pending a decision, under the Immigration and Nationality Act (8 U.S.C. 1101 et seq.), on whether the aliens are to be removed from the United States and, if such aliens are ordered removed from the United States, until such aliens are removed. The detention standards for the single adult detention capacity described in subsection (a) shall be set in the discretion of the Secretary of Homeland Security, consistent with applicable law.

(c) DEFINITION OF FAMILY RESIDENTIAL CENTER.—In this section, the term "family residential center" means a facility used by the Department of Homeland Security to detain family units of aliens (including alien children who are not unaccompanied alien children (as defined in section 462(g) of the Homeland Security Act of 2002 (6 U.S.C. 279(g)))) who are encountered or apprehended by the Department of Homeland Security.

…

## SEC. 100051. APPROPRIATION FOR THE DEPARTMENT OF HOMELAND SECURITY.

In addition to amounts otherwise available, there is appropriated to the Secretary of Homeland Security for fiscal year 2025, out of any money in the Treasury not otherwise appropriated, $2,055,000,000, to remain available through September 30, 2029, for the following purposes:

…

(8) REMOVAL OF SPECIFIED UNACCOMPANIED ALIEN CHILDREN.—
    (A) IN GENERAL.—Funding removal operations for specified unaccompanied alien children.
    (B) USE OF FUNDS.—Amounts made available under this paragraph shall only be used for permitting a specified unaccompanied alien child to withdraw the application for

83

admission of the child pursuant to section 235(a)(4) of the Immigration and Nationality Act (8 U.S.C. 1225(a)(4)).

(C) DEFINITIONS.—In this paragraph:

(i) SPECIFIED UNACCOMPANIED ALIEN CHILD.—The term "specified unaccompanied alien child" means an unaccompanied alien child (as defined in section 462(g) of the Homeland Security Act of 2002 (6 U.S.C. 279(g))) who the Secretary of Homeland Security determines on a case-by-case basis—

(I) has been found by an immigration officer at a land border or port of entry of the United States and is inadmissible under the Immigration and Nationality Act (8 U.S.C. 1101 et seq.);

(II) has not been a victim of severe forms of trafficking in persons, and there is no credible evidence that such child is at risk of being trafficked upon return of the child to the child's country of nationality or country of last habitual residence; and

(III) does not have a fear of returning to the child's country of nationality or country of last habitual residence owing to a credible fear of persecution.

(ii) SEVERE FORMS OF TRAFFICKING IN PERSONS.—The term "severe forms of trafficking in persons" has the meaning given such term in section 103 of the Trafficking Victims Protection Act of 2000 (22 U.S.C. 7102).

…

SEC. 100052. APPROPRIATION FOR U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT.

In addition to amounts otherwise available, there is appropriated to the Secretary of Homeland Security for U.S. Immigration and Customs Enforcement for fiscal year 2025, out of any money in the Treasury not otherwise appropriated, $29,850,000,000, to remain available through September 30, 2029, for the following purposes:

…

(8) FAMILY UNITY.—Promoting family unity by—
 (A) maintaining the care and custody, during the period in which a charge described in clause (i) is pending, in accordance with applicable laws, of an alien who—
  (i) is charged only with a misdemeanor offense under section 275(a) of the Immigration and Nationality Act (8 U.S.C. 1325(a)); and
  (ii) entered the United States with the alien's child who has not attained 18 years of age; and
 (B) detaining such an alien with the alien's child.

One Big Beautiful Bill Act, Pub. L. No. 119-21, §§90003, 100051-52, 139 Stat. 72, 358-59, 385-89 (2025).